May it please the court, Lawrence Rosenberg, I would like to introduce my student, Devon Redding, who is a third-year student at the West Virginia University College of Law and our Supreme Court Litigation Clinic. She is a qualified law student and will be presenting argument today. I look forward to hearing your argument. Good morning, your honors. May it please the court. This court should reverse the district court's decision and hold that Mr. Mays' Fifth Amendment due process and equal protection claims are cognizable under Bivens. Mr. Mays' claims do not present a new context and fall squarely within prior Bivens precedent. But even if Mr. Mays' claims do present a new context, there are no special factors counseling this court's hesitation in extending a Bivens remedy in this case and no reason to think that Congress would want to withhold a remedy in this case. Moving first to Mr. Mays' equal protection claims, these claims are not meaningfully different from the claims recognized in Davis v. Passman, where the court recognized that the Fifth Amendment confers on an individual the constitutional right to be free from illegal discrimination. Although gender discrimination was at issue in Davis, the court recognized that individuals are protected against all types of illegal discrimination. Speak to the reality of where the Supreme Court is on Bivens claims. There are directions in which you, even as you're going now, even if we were to agree with you, there are some restraints which will operate not only from the Supreme Court but from this court in terms of how we deal with Bivens case. And you correctly point out that there's a Fifth Amendment-based Bivens claim from Davis that we can look upon, but then you also did notice the Supreme Court quite candidly that that's a different situation. There's one for procedural due process and the others for race discrimination. So, I mean, I don't want to make it just an academic proceeding, but I think we have to and what the Supreme Court has, I think, somewhat unusually been rather forthright in terms of what it thinks of as precedent in this case. And deal with that and how you think we can get around what the Supreme Court seems to be very clear, about as clear as you can be, even if it's dicta, advisory, or whatever, it's signaled this thing pretty clear to us. Talk to us about it. Yes, Your Honor. So, Davis v. Passman was one of the three cases that the Supreme Court recognized judicial remedy, a judicially created remedy under Bivens. That case is factually analogous and legally analogous to the claims Mr. Mays raises about equal protection. As you mentioned, Your Honor, his due process claims could present this court with a new context. In that case, the Supreme Court directs courts to look at special factors and go through the Abbasi special factor analysis. Importantly, recent Bivens decisions, such as Egbert v. Boole, Ziegler v. Abbasi, and Hernandez v. Mesa, all implicated large-scale executive policy, which is not at issue here. Mr. Mays is challenging individual instances of constitutional deprivations. He is not challenging large-scale executive policy, as we have seen in recent... I thought Egbert sort of told us that that's the wrong level of granularity, right? That, you know, in Egbert, we got to look at sort of border security writ large, right? We're not looking at this one particular incident. We got to look at sort of the impact on border security. You know, border security is important, but, you know, we also house a lot of inmates, right? And so why wouldn't we look at, you know, general Bureau of Prisons effectiveness, just like we look at border security effectiveness in a similar way? Well, Your Honor, I believe when the court looks at Mr. Mays' specific claims and considers the potential burden on prisons and the prison administration system, the court will find that there's no undue burden on prisons or prison administration. Going back to the Egbert point, Your Honor, Mr. Mays' claims do not implicate large-scale policy. They challenge... I mean, the Bureau of Prisons is a pretty large-scale program, right? I mean, it's... I mean, I don't know how many, but there are lots and lots of people in federal prison. There are lots and lots of people who work as federal prison guards. Maybe not as many as border security, but it's in the same order of magnitude. So why am I thinking about the Bureau of Prisons fundamentally different than Border Patrol? Yes, Your Honor. So in Abbasi, the court took special care to recognize that Fifth Amendment claims, like Mr. Mays', do not impact the adoption or execution of prison administration policies. So there's... there would be no undue burden on the prison system. Wasn't that Egbert too, right? Like the particular claim in Egbert wouldn't have, like, limited policies or procedures, would it? Well, Your Honor, I believe the particular claim in Egbert in reference to the Fourth Amendment claim, the court considered how a unique operational mission in terms of national security implications. Here, again, we don't have any large-scale policy implications. And these are, in fact, the exact type of claims that the court in Abbasi recognized are most efficiently addressed by way of a judicially created remedy. In reference to Mr. Mays' equal protection claims, these aren't claims that are unique to the prison system. These claims mirror the claims in Davis, and those claims arise from a typical workplace interaction and a typical supervisor-employee relationship. That Mr. Mays' supervisor-employee relationship and that his workplace was inside of a prison is not a meaningful difference. Mr. Mays was the lead mechanic, and he received training on relevant equipment to work in the Unicor Optics Factory. The allegations of discrimination by his Unicor supervisor are that he was without information and without necessary tools needed for Mr. Mays to perform his job. So the uphill battle that I was referring to, and that's why I say we could engage in an academic discussion, but the reality is what it is. There have been three Bivens cases that the Supreme Court has decided, and since, I guess, the last 12 years, 12 times or so, the court has not done anything to expand that. It sort of shut the door on that, and the court's been pretty explicit. It says, you know, if there's a basis for expanding Bivens, then they'd love to see if there's any rational reason, any reason, I mean, gone out of the way to say it, that Congress would be better suited to weigh on this than the courts. So tell me, can you think of even one reason why the Congress here would be, as opposed to the court, should be the one to authorize these type of damages as opposed to the court? Well, frankly, Your Honor, as I mentioned before, again, Mr. Mays is challenging individual instances of constitutional deprivations. The court has recognized that these types of challenges are difficult to address except by way of damages actions after the fact, and courts routinely engage with these type of inmate claims, and they routinely engage with the rights of prisoners and determine standards for the treatment of inmates in the BOP system. I just want to make sure I understand the argument. Is the argument you're making that it would be hard for Congress to fashion such a remedy? No, Your Honor. It's sort of done it in other contexts, right? Like we're, you know, 1983 sort of seems to come to mind, right? Like they seem to be able to do it, at least in other contexts. Why wouldn't we think so here? Well, Your Honor, I'm not suggesting that it would be difficult for Congress to remedy in this case. I'm merely suggesting that congressional silence may be important in this case. So the fact that a congressionally created remedy for Bivens-type claims has never occurred, but yet Congress was able to pass the Federal Tort Claims Act, which switched the liability and gave plaintiffs an opportunity to hold the government directly liable in order to replace individual liability. So Congress's silence on Bivens may mean that they endorse a judicially created remedy for individual liability. Would that argument apply to each of the claims that the Supreme Court has rejected Bivens on the last 12? I mean, I get the argument, right? I'm not even saying it's a bad argument. I'm just saying it would similarly apply, would it not, to all of the previous 12 attempts the Supreme Court has shot down, right? If I'm understanding your question correctly, Your Honor, I think that, yes, Congress has had an opportunity to create a legislative remedy or a remedy by statute. My point being is that if you rely on legislative silence, wouldn't Egbert come out different? Wouldn't Abbasi come out different, right? If legislative silence was a knob to give the two of us or the three of us that authority, then we would have had that authority in Egbert and Abbasi, and I could go on with the list, right? Your Honor, I think critically with Egbert, Abbasi, and even Hernandez Mesa, it was really the special analysis and those unique national security considerations, as I mentioned before in Egbert, particularly with reference to the Fourth Amendment claims, it was really looking at the Border Patrol's unique mission and understanding the interplay with border security and national security. So I really think in those cases, which really challenged large scale executive policy, they're fundamentally different from the claims Mr. Mesa is raising here. Well, take, for instance, the prison litigation performance. Congress enacted that after those three cases, but it did not make a provision for damages. What do you make of that? Well, Your Honor, the PLRA does not foreclose inmate claims for administrative remedies before seeking monetary damages and bringing suit in federal court. And I think in that sense, the PLRA is complimentary. It's not exclusionary. The legislative history of the PLRA also bears this out. It shows that Congress specifically amended the PLRA after the court's decision in McCarthy v. Madigan to remove judicial discretion on what constitutes a minimal acceptable standards for administrative exhaustion. They codified administrative exhaustion requirements, but that codification did not foreclose inmates from bringing civil rights claims or claims for monetary damages. And I think if we look at when the PLRA was enacted, noting that it was enacted against the backdrop of Bivens, we can infer that Congress assumed that a Bivens remedy would be available to inmates. Your Honor, if you don't have any further questions, I will move to Mr. Mesa's due process claims. Again, Mr. Mesa's due process claims are not meaningfully different from those recognized in other cases. How are you going to go there with our case in Bolger? Yes, Your Honor. So in Bolger, this court did reject Bistrian v. Levi, which is the court we briefed our reliance on. However, that's an Eighth Amendment failure to protect claim, which is fundamentally different from the Fifth Amendment due process claims that were put forth in Bistrian and put forth by Mr. Mesa. I think particularly important is that this also reflects Abbati's reasoning that one of the reasons to find a new context is a different constitutional right or the implication of a different constitutional right. And here, the court did just that. So I think it's particularly distinguished because it's been Bolger v. Horwitz is an Eighth Amendment failure to protect claim. I also believe that Bolger reflects this court's reasoning in Bivens cases, where it adopts a case-by-case approach to assess the viability of Bivens remedies for federal prisoners. And it also emphasizes Abbati's conclusion that if this court should find a new context, they can conduct a special factors analysis. And as I mentioned before, Your Honor, under this Abbati framework, there is no reason to withhold a remedy here or to think that Congress would want to withhold a remedy in terms of Mr. Mesa's challenges to individual instances of conduct and individual instances of constitutional deprivations. All right. Is there anything further? Nothing, Your Honor, unless you have any questions. Justice Trenchlet? No, thank you. All right. You have a few minutes in rebuttal reserve. Thank you. We will hear from the employee in this matter. Good morning, Your Honors. Assistant United States Attorney Sharon Wilson, I am here to introduce to the court, and we thank you so much for hearing from our students. Marie Cepeda-Mikosh, she is one paper away from graduating from Duke on Friday, so we're so excited. Your Honors, and may it please the court, my name is Marie Cepeda-Mikosh, representing Acolise. Your Honors, as you pointed out in its recent decision in Egbert, the Supreme Court emphasized that courts should decline to extend Bivens if there's any reason to think that Congress is better equipped to create a damages remedy in that case. Therefore, this court should affirm the ruling below and decline to extend Bivens for two reasons. First, opponents' claims arise in a new context from the existing Bivens context. And second, important special factors counsel hesitation in expanding Bivens to this case, including those that the court found significant in declining to extend Bivens in Folger, such as the existence of an alternative remedial scheme and congressional intent to limit court interference into the prison context. Can you help me understand the line in Egbert that it is any reason to think that Congress would be better than the courts? And yet, so that seems to be like a pretty easy standard. But the court then says that you have to do it in each case, right, where I think we could probably say that there's always a reason to think that Congress is better than we are in most everything, right? So, like, why is the court telling us to do this individual analysis at the same time setting up a test that is plainly going to be met in every single case? Your Honor, I'm not sure the reasoning behind that test, but the Supreme Court in Egbert did note that in almost every situation, the answer to that question will be yes. So, while respecting the existing precedent, the court is limiting those cases almost to their facts in future cases. And here, the context of this case is just fundamentally different from that which occurred in Davis. Can you talk about why it's fundamentally different? I mean, we tend to think about, if anything, our Constitution being more protective of race-based claims than of gender-based claims. Think about the tiers of scrutiny that we apply. So, help me understand that. Yes, Your Honor. So, the difference between race discrimination and gender discrimination isn't the only difference in this case. For example, in addition, this took place in the prison context, which is fundamentally different from just your typical day-to-day employment context. Prison officials have to make many discretionary decisions in inmate work assignments from, for example, deciding whether it's a safety and security threat to give someone a particular tool or particular information. What was the work context of Davis? In that case, the congressman fired his secretary for being a woman. Right. And we think about Congress having sort of special concerns, too, right? Both about safety and security, right? We have issues that we've, you know, repeatedly hear about, right? The safety and security of government officials, right? And so, I mean, yes, they're a little bit different, but it's not like this is in the McDonald's setting or some non-secure facility. You know, we are often concerned with Congress and its security, right? Just like we might be concerned about prisons and the security there. Why is that meaningfully different? Your Honor, even in Egbert, the court noted that Davis went under a different type of analysis than the court uses today. So, it didn't really consider those special factors in its analysis, whether there might be particular concerns. Right. But I think what I'm really asking is, like, why is this really a different case, right? In other words, you might say the greater includes the lesser, right? If we're going to protect gender discrimination in a context where security is paramount, and I think, I assume you're not arguing that security in Congress isn't paramount. No. So, then it seems like to me that's the greater that if we're going to protect that, then obviously we would similarly protect race-based claims in a prison context where security is paramount, right? Why isn't that the analysis at the step one of whether this is the same context is that the greater includes the lesser? Your Honor, the Supreme Court has made it very clear that even in very parallel circumstances, we're still to look to whether special factors counsel hesitation. And here, the situation is not even exactly parallel. Beyond the employment context, Mr. Mays is also alleging violations related to his placement in administrative detention, his transfer to a different facility. And these claims taking place in a prison context where every single decision that an official makes, even, for example, whether to give someone a paperclip could be used as a weapon potentially in prison in a way that I think you typically wouldn't think of in the congressional setting. So, that is the security context that they are facing and that officials are making decisions in is just fundamentally different than in the congressional employment setting. Can you talk a little bit about the alternative remedial scheme? So, if we got to the special factors, why you think there's an alternative remedial scheme that was available here? Yes, Your Honor. So, in the prison context, prisoners who are facing similar conditions of confinement claims to Mr. Mays have multiple administrative remedies available to them. First, the BOP has the administrative remedy program, which both this court in Bulger and the Supreme Court in Moleskoe found relevant to determining that they should- Does that extend to these employment-based claims? I get the non-employment-based employment, maybe we have to put that in quotes, but let's call that the employment claim. Do those remedies extend to the employment context? So, is that an available remedy if you say, I've been racially discriminated against in the shifts that I'm getting in the prison workshop? Yes, Your Honor. There are policies governing inmate work assignments and that is a type of claim that an inmate can bring grievances about through the administrative remedy program. And in addition to the administrative remedy program, other remedies could be available to an inmate who is in Mr. Mays' situation, including suing for injunctive relief, mandamus relief, or declaratory relief. And again, the existence of these alternative remedial schemes was sufficient in Bulger to conclude that that was a special factor that warranted declining to extend Bivens because the court could conclude that Congress and the executive branch are better equipped to determine whether those remedies are sufficient in this case. I'm sorry. Does the remedial scheme include as well retaliatory claims? So in other words, it seems easily to, or at least arguably to include the substantive discrimination, but is there a provision in the remedial scheme, the prison grievance system, for retaliatory claims? So in other words, for making the claim itself, retaliation for making the original grievance itself? Your Honor, I am not sure whether the policies governing it say anything about retaliation specifically, but I do believe that inmates are able to bring those claims through the administrative remedy program. Are they examining that? That's what, when I look at the policies, they don't seem to address retaliation. Why should we think that retaliation is included? I understand, other than just you thinking it? Your Honor, I'm not sure if the answer to that question, I apologize. When we look at the three cases, the legal case from Inez and Gilbert cases, those are the cases that dealt with what appears to be sensitive contacts of national security or border-type cases. And so when we look at that from a restrictive analysis is, why wouldn't these claims pass muster? I mean, the Supreme Court has indicated that when you have that context there, you can proceed. Sorry, Your Honor. You're saying when you don't have the sensitive national security context, you can proceed? You had the three cases in which those issues were troubling to the court, but those issues are not here. So why is it this particular one would be one that would trouble the court also? We're not dealing with national security, military, or immigration concerns. Your Honor, there are also significant concerns regarding security and safety in the prison context. And those concerns raise many discretionary decisions that officials have to engage in on a day-to-day basis, similar to in those other contexts. The Supreme Court has been concerned about the court intruding into kind of these day-to-day discretionary decisions that could have system-wide implications. And if the courts are to look at every determination in a prison of whether to give an inmate a particular tool or whether to place an inmate in one work assignment versus another work assignment, this will involve a significant level of judicial interference into an area that Congress has expressed an intent to limit. What if we view this that Mays is not asking to have imposed a systematic liability against these officials, but instead is similar to what was done in Ziegler, an individual circumstance of law enforcement type of use or approach to this? Does that change the analysis, the fact that it is not seeking a systematic type liability? No, Your Honor. It doesn't change the circumstances here. Ultimately, the fundamental question is whether there are reasons to think that we should defer to Congress on whether a damages remedy is appropriate within a particular system. So here, for many of the reasons already discussed, there are reasons to think that Congress would be better equipped. And the fact that Mr. Mays didn't get a remedy in this particular case doesn't necessarily mean that a judicially created remedy is appropriate, as the Supreme Court has noted in Egbert and also in Schweiger. Instead, the question is really, as this court said in Boulder, the question is really whether looking at this elaborate remedial scheme, should the court augment it by creating a judicially created remedy? And Egbert has said that in almost every case, the answer to that question is no. And continuing on the separation of powers concerns that are in this case, here, as Your Honor has already mentioned, Congress has legislated frequently and intensely in this area, including through the PLRA, but they've never authorized an individual damages action for inmates. And contrary to what the appellant argues, that congressional silence can be read to allow for such a remedy, Supreme Court precedent has shown that we don't read from congressional silence an intent to create a remedy, but rather the opposite, that the court should then defer to Congress on the issue of the case. And similarly, as I mentioned earlier, a case like this threatens significant intrusion into sensitive and discretionary executive branch functions. The case law on this matter is clear. The Supreme Court, in turn, said that running prisons is particularly within the purview of the executive and legislative branches. And Congress through the PLRA sought to limit both prisoner litigation and court oversight of the day-to-day operations of prisons. In addition, Congress has delegated significant authority to the BOP over prison life and and has given BOP a lot of discretion over the particulars of how prisons are run. Therefore, this court should defer to Congress on whether a damages remedy would helpfully augment that system and create additional deterrence against these types of violations that Mr. Mase has alleged. If your honors have no other questions, may I briefly conclude? Your honors, this case represents a fundamentally different context from any of the existing three Bivens contexts, including Davis. And special factors such as the existence of an alternative remedial scheme and separation of powers concerns suggest that the court should defer to Congress on whether a damages remedy is appropriate in this situation. Therefore, we ask that the court affirm the lower court's ruling and decline to extend Bivens in this case. Thank you. Judge Streisand, do you have any questions? No, thank you. Thank you, Ms. Redding. We'll hear from, sorry, Ms. Mekos. Is that right? We'll hear from you, Ms. Redding. Thank you, your honor. I have three points on rebuttal. First, with reference to Mr. Mase's equal protection claim, I want to emphasize that this is not a new context and it does not happen. Again, Mr. Mase's individual claims of discrimination arise in a traditional workplace context. The Unicorn Optics Factory, where he worked, is a traditional workplace. It's just inside the walls of a prison. But importantly, one of the reasons that it does not implicate large-scale prison administration or prisoner security, institutional security concerns, is that the Unicorn Optics Factory operates like a traditional factory. Mr. Hoskins, who is Mr. Mase's first-line supervisor, is not a corrections officer. And while he may have some input into the own any part of the prison administration process. In terms of Mr. Mase's equal protection claims, there's no need for this court to get to a special factors analysis. Again, he is alleging racial discrimination, which falls under the same umbrella of illegal discrimination that the court recognized in Davis v. Passman. And the court brought up the scrutiny applied to each of those types of discrimination. At bottom, racial discrimination is illegal discrimination. And as the court noted, it receives a higher level of scrutiny, indicating that it is of the same type of discrimination that was recognized in Davis. Mr. Mase. Why don't I actually cut the other way, right? Because we're asking simply whether it's different, right? And yeah, it's higher, but it's different, right? So, I mean, it's in the scrutiny case at some level, but doesn't that suggest to us actually that there is a difference? Your Honor, the racial discrimination Mr. Mase alleges is not meaningfully different from the discrimination raised by the plaintiff in Davis. And that is the key. It needs to be important. Importantly, the court invoked Bowling v. Sharpe in their holding in Davis v. Passman, which was a racial discrimination case. So, this indicates, again, that Mr. Mase's racial discrimination claims are of the same type as the gender discrimination claims raised by the plaintiff in Davis. And it also just outlines the contours of equal protection claims recognized in that case. Again, the umbrella of illegal discrimination that the court was contemplating, which Mr. Mase's claims of racial discrimination fall squarely within. My next point, Your Honor, I want to talk a little bit about administrative remedies. The idea that Mr. Mase could motion for an injunction or for any sort of other remedy is not practical. He was in administrative confinement without counsel. Practically speaking, it was impossible for him to enjoin the constitutional deprivations and those actors who were depriving him of his constitutional rights from administrative detention. Additionally, going through an administrative process, which Mr. Mase did, and he did exhaust the administrative remedy process, he would be bringing the claims to the same individuals who retaliated against him. For Mr. Mase, like the plaintiff in Davis, there is no other remedy. It is damages or nothing. Your Honor, I see that I have exceeded my time. So, if you have no further questions. Thank you very much. Thank you. The court will acknowledge Professor Rosenberg for the fine job that you have done in bringing a student to us. You were court-appointed and we appreciate the fine argument for you, Ms. Redding. The court could not do what it does without court-appointed counsel. I should have mentioned in the earlier case that Mr. Theo was also court-appointed and the court is very appreciative of court-appointed services to help us get our work done here. Likewise, Ms. Wilson, as the supervisory attorney there at the AUSA, you brought a fine student to us who both students presented, we believe, excellent arguments. I think Judge Richardson and Judge Traxler would agree with me that our legal profession appears to be in good hands for the future if this is the caliber of lawyer you're going to be sending us. So, thank you both. Judge Traxler, did you have anything further to proceed to the last case?
judges: James Andrew Wynn, Julius N. Richardson, William B. Traxler Jr.